**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BEVERLY A. HAISLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 08-1463** |
| | ) | |
| **SEDGWICK CLAIMS** | ) | |
| **MANAGEMENT SERVICES, INC.,** | ) | |
| **PNC FINANCIAL SERVICES GROUP,** | ) | |
| **INC., and THE PNC FINANCIAL** | ) | |
| **SERVICES GROUP, INC., LONG** | ) | |
| **TERM DISABILITY PLAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

**Conti, District Judge**

**I.      Introduction**

Pending before the court are cross-motions for summary judgment filed by plaintiff

Beverly A. Haisley ("Haisley"or "plaintiff") and defendants Sedgwick Claims Management

Services, Inc. ("Sedgwick"), PNC Financial Services Group, Inc. ("PNC"), and the PNC

Financial Services Group, Inc., Long Term Disability Plan (the "Plan" and together with

Sedgwick and PNC "defendants").  (ECF Nos. 56 & 59.)  For the reasons that follow, Haisley's

motion for summary judgment will be granted in part, and defendants' motion for summary

judgment will be denied.  The Plan will be required to pay long term disability ("LTD") benefits

to Haisley for the period commencing on October 3, 2007, and ending on October 2, 2009, and

the case will be remanded for a determination whether plaintiff is entitled to benefits after

October 2, 2009.

## II.     Background

Haisley was born on April 13, 1951.  (ECF No. 1 ¶ 7.)  She was employed by PNC between May 3, 1971, and June 22, 2007.  (Administrative Record ("AR") AR0034.)  As of June 22, 2007, she was working as a Collections/Recovery Team Manager.  (ECF No. 104 ¶ 1.)  In this capacity, Haisley managed a team of adjustors responsible for collecting on accounts that had been delinquent for thirty days or more.  (ECF No. 96  ¶ 2.)  Her monthly salary was $4,708.33.  (*Id.* ¶ 1.)

Haisley's mother died on June 28, 2007.  (AR0027.)  Haisley applied for short-term disability ("STD") benefits.  (ECF No. 96 ¶ 18.)  This request was based, at least in part, on depression and anxiety suffered by Haisley as a result of her mother's death.  (*Id.*)  At that time, Haisley was also suffering from peripheral neuropathy.  (AR0027-29.)  PNC approved Haisley's request for STD benefits for a full period commencing on July 5, 2007, and concluding on October 2, 2007.  (ECF No. 96 ¶¶ 18-19.)  She received STD benefits at the rate of 100% of her monthly salary.  (*Id.* ¶ 19.)

The Plan provides full-time, salaried employees who are unable to work for more than ninety days with long-term disability ("LTD") benefits of up to 70% of their base salaries.  (ECF No. 104 ¶ 2.)  Haisley participated in the Plan because of her employment with PNC.  (*Id.* ¶ 1.)  PNC established a "Group Benefits Trust" to fund LTD disability payments made pursuant to the Plan.  (AR0296-97.)  As the Plan Administrator, PNC has the power "[t]o determine the eligibility and status of any [e]mployee with respect to Plan participation."  (AR0233, AR0245.)  PNC administers and funds the Plan as follows:

> 5.      The Plan is a fully self-funded employee welfare benefit plan as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

The Plan provides long term disability benefits for eligible employees of PNC. A third party does not insure the Plan. It is self-funded by means of a separate trust established by PNC solely for the purpose of providing benefits. The Trust is known and referred to as the "Group Benefits Trust" (the "GBT").

6.      PNC makes fixed, periodic cash contributions to the GBT based on calculations and projections of its future long term disability liability performed by an independent actuary. PNC holds no residual interest in the assets of the GBT. Rather, any and all monies in the trust are contributed without condition at all times and at all times must be used for the exclusive benefit of Plan participants or beneficiaries.

7.      Long term disability benefits determined to be payable under the terms of the Plan are paid from the GBT.

(Kerry A. Allen, Aff. Sept. 11, 2009, AR0334.)

The Plan is administered pursuant to a service agreement (the "Service Agreement") executed by PNC and Sedgwick in December 2004. (AR0251-76.) The Service Agreement delegates to Sedgwick the responsibility for administering LTD claims under the Plan. (AR0271.) In accordance with the Service Agreement, Sedgwick receives, investigates and responds to LTD claims filed by employees of PNC. (ECF No. 96 ¶ 11.) Under the Service Agreement, PNC is responsible for providing Sedgwick with sufficient funds to cover LTD claims, and Sedgwick is expressly relieved of the obligation to advance its own funds to cover such claims. (AR0273.) The Plan defines the terms "Total Disability" and "Totally Disabled" as follows:

21.      "Total Disability" and "Totally Disabled" mean that because of Injury or Sickness:

    a.      The Participant cannot perform each of the material duties of his or her regular occupation; and

    b.      After benefits have been paid for 24 months, the Participant cannot perform each of the material duties of any gainful occupation for which he or she is reasonably fitted by training, education or experience.

(AR0234.)  The Plan contains a "Mental Illness Limitation," which provides:

a.    Benefits for Total Disability due to mental illness will not exceed 24 months of Monthly Total Disability Benefit payments unless the Participant meets one of the following:

    (1)    The Participant is in a hospital or institution and is still Totally Disabled as a result of the mental illness at the end of the 24-month period.  In this case, the Monthly Total Disability Benefit will be paid during the Participant's confinement in the hospital or institution.

    (2)    If the Participant is still Totally Disabled when he is discharged from a hospital or institution as set forth in III.14.a.(1), the Monthly Total Disability Benefit will be paid for a recovery period of up to 90 days.

    (3)    If the Participant becomes re-confined in a hospital or institution as a result of such mental illness during the recovery period for at least 14 days in a row, Total Disability Benefits will be paid for the confinement and another recovery period up to 90 more days.

Notwithstanding the foregoing, benefits for Total Disability due to mental illness will not be paid for a period longer than 180 days from the expiration of the 24-month period.

(AR0242.)  The term "mental illness," as used in the language of the Plan, means "mental, nervous or emotional diseases or disorders of any type."  (AR0243.)

At the conclusion of her STD period, Haisley believed that she was still incapable of performing the duties of her job.  (ECF No. 96 ¶¶ 20-21.)  She applied for LTD benefits on October 11, 2007.  (AR0053-58.)  On the application, Haisley indicated that she was disabled due to depression, anxiety and neuropathy.  (AR0053.)  She reported that she first noticed her symptoms on May 2, 2007, and that her last day of work was June 22, 2007.  (*Id.*)

In support of her claim, Haisley submitted written reports which were supplied by her treating health-care providers.  (ECF No. 96 ¶¶ 22-26.)  Included with these reports were the results of nerve conduction studies which were conducted on August 15, 2007.  (AR0075-76,

AR0086-87.) These studies showed Haisley to be suffering from "diffuse peripheral neuropathy" that was deemed to be of "mild to moderate severity." (AR0076.) Charlotte Graham ("Graham"), an LTD case worker employed by Sedgwick, requested additional information from Haisley's treating physicians. (AR0084-85.)

In response to an inquiry from Graham dated October 19, 2007, Dr. Dushan Majkic, Haisley's primary care physician, reported that Haisley was suffering from both peripheral neuropathy and a relapse of major depression. (AR0084.) Dr. Majkic opined that Haisley was unable to concentrate because of the side effects of her medication, she could not sit or stand for prolonged periods of time, and her prognosis for returning to gainful employment was "undetermined." (*Id.*)

In a letter to Graham dated November 9, 2007, Dr. Sidney W. White, Haisley's clinical psychologist, stated that he began to treat Haisley on July 17, 2007. (AR0088.) According to Dr. White, the "immediate precipitant" of Haisley's symptoms was the death of her mother on June 28, 2007. (AR0089.) In the letter, Dr. White explained:

> Ms. Haisley currently does not possess the functional capabilities just mentioned that are necessary for the effective performance of her job. Besides the pain from the Peripheral Neuropathy, Ms. Haisley is emotionall [sic] drained and physically exhausted most days. She does not have the motivation, energy, and emotional strength to follow leadership, much less provide it for her employees. Ms. Haisley's current cognitive impairments are equally compromising and preclude the effective performance of her job. She is unable to sustain focus and concentration on a consistent basis. While her cognitive abilities are intact, they are nevertheless slowed and deliberate. Ms. Haisley is not currently able to process information efficiently or make decisions quickly. She is also experiencing lapses in her short-term memory.
>
> Ms. Haisley views her current absence from work as a necessity, and this is the recommendation of both Dr. Majkic and myself. Ms. Haisley's absence from work is thus a collaborative decision. I am hopeful that Ms. Haisley's depressive symptoms will eventually remit, but at the present time and foreseeable future I do not believe she can perform her work.

The symptoms and impairments that I have noted are based both on Ms. Haisley's self-report and on my own clinical interview interactions and observations of Ms. Haisley. I have tried to describe specific and concrete tasks inherent in Ms. Haisley's work. I have then tried to indicate how Ms. Haisley's physical, emotional, and cognitive impairments preclude any effective performance of her work-related tasks.

(AR0090.) Dr. White expressed his willingness to provide further information in connection with Haisley's LTD claim. (AR0091.)

On November 30, 2007, Graham sent Haisley a letter stating that Sedgwick approved her application for LTD benefits.[1] (ECF No. 63, Ex. K, BAH00125-27.) The applicable LTD period began on October 3, 2007. (AR0027.) A Sedgwick supervisor recommended on December 6, 2007, that the "approval" of Haisley's claim be rescinded until additional medical records could be received and evaluated. (AR0025.) In order to receive LTD benefits under the Plan, Haisley was required to apply for disability benefits under the Social Security Act ("SSA"), 42 U.S.C. §§ 401-33, 1381-83f. (AR0283.) For this reason, she applied for social security disability benefits. (ECF No. 96 ¶ 29.) Haisley was ultimately awarded disability insurance benefits under Title II of the SSA. (AR0016; ECF No. 63, Ex. K, BAH000071.)

In a letter dated December 20, 2007, Graham informed Haisley that her claim for LTD benefits had been "formally suspended" as of December 1, 2007, due to "a lack of current treatment information on file supportive of continuing total disability." (AR0100.) In that letter Graham stated that Dr. White's report of November 9, 2007, had not been supported by treatment records or documentation concerning Haisley's medications. (AR0101.) Haisley was

---

[1] The parties disagree about how Haisley's receipt of LTD benefits was effectuated. Haisley contends that Sedgwick approved her claim for LTD benefits. (ECF No. 96 ¶ 27.) Defendants argue that Haisley "automatically and conditionally began receiving LTD benefits" based on the *filing* of her application, and that no final decision concerning Haisley's entitlement to benefits was made as of November 30, 2007. (*Id.*) The position taken by defendants is refuted by the documentary record, which contains a letter from Graham to Haisley stating that Sedgwick "approved benefits" on the basis of Haisley's major depression. (ECF No. 63, Ex. K, BAH000125.)

given until January 17, 2008, to provide Sedgwick with more detailed information about her treatment regimen.  (*Id.*)

Haisley was experiencing discomfort in both her lower extremities.  (AR0102.)  On December 27, 2007, she was examined by Dr. Richard B. Kasdan, a neurologist.  (*Id.*)  Suspecting that Haisley's problems had a "lumbar source," Dr. Kasdan recommended that she undergo a magnetic resonance imaging ("MRI") scan.  (*Id.*)  Although the MRI scan revealed that Haisley had experienced "minor disc changes," it showed "nothing to explain her leg numbness."  (AR0103.)

Dr. White responded to the suspension of Haisley's LTD benefits in a letter to Graham dated December 31, 2007.  (AR0094-95.)  He claimed that Graham "misrepresented" the contents of his earlier report.  (AR0094.)  After providing more specific information about Haisley's medication regimen, Dr. White wrote:

> As I indicated in my 11/9/07 report, and as may be gleaned from the above-noted medications, Ms. Haisley is struggling with a convergence of difficult symptoms. Her mood is markedly worried and depressed, a persistent sleep disturbance has left Ms. Haisley physically exhausted and continually fatigued, and the daily neuropathy pain has significantly limited her mobility.  The cognitive impairments noted in my 11/9/07 report remain prominent.  Not yet having found any relief for the neuropathy pain, Ms. Haisley is only more worried and preoccupied in her thoughts.  Faced with this extensive symptomology, there is no way Ms. Haisley can return to work at the present time.  Ms. Haisley does attend to her personal hygiene, but her activities are mainly confined to keeping doctor's appointments and some light housework when motivation and energy permit.  She cannot sustain focus and concentration long enough to read or watch a full length program on television.

(AR0095.)  Haisley provided Sedgwick with treatment records from Dr. Majkic and Dr. Kasdan.

(ECF No. 96 ¶¶ 31-34.)

On February 29, 2008, Sedgwick denied Haisley's application for LTD benefits.[2]

(AR0133-136.) In a letter informing Haisley about Sedgwick's decision, Graham stated that the denial was based on peer reviews which had been completed by Dr. Reginald A. Givens, a psychiatrist, and Dr. Sankar Pemmaraju, a physiatrist. (AR0134-35.) Graham made the following comments about Dr. Givens' peer review:

> A peer review was completed on January 18, 2008 by Dr. Reginald A. Givens, a board certified psychiatrist. Dr. Givens also held a teleconference with Dr. White on January 17, 2008. Dr. Givens reviewed your file records and determined there was no evidence of delusions or hallucinations. You were oriented to person, place and time. You were articulate, coherent and capable of reasoning with slowed and deliberated speech. Your mood was described as markedly depressed with punctuations of anxiety and affect mostly flat. Dr. Givens indicated that [sic] was no specific testing of cognitive functioning in the records but only subjective complaints of difficulty with concentration and memory. Dr. Givens finds there is insufficient objective evidence in medical records from a psychiatric perspective to support your complete inability to work due to cognitive dysfunction. There is no evidence or documentation of impairment so significant that would limit your activities of daily living or prevent a return to work.

(AR0134.) In the letter Graham stated that Dr. Pemmaraju unsuccessfully attempted to conduct teleconferences with Dr. Kasdan on February 12, 2008, and February 14, 2008. (AR0135.)

With respect to Dr. Pemmaraju's findings, Graham explained:

> In his review, Dr. Pemmaraju found no abnormalities exist outside the notation of diffuse peripheral neuropathy that was likely idiopathic in nature. There was no documentation to support radiculopathy, plexopathy, or entrapment mononeuropathy. There were no objective functional measures detailing your overall objective abilities including overall effort as well as validity of testing. Dr. Pemmaraju concluded there was no available clinical documentation supporting any significant or severe positive objective findings that would have prevented a return to work.

(AR0135.)

---

[2] The letter informing Haisley about the denial of her claim was mistakenly dated February 29, 2007, rather than February 29, 2008. (AR0133.) The record contains a "revised" copy of the letter bearing the correct date. (AR0216.)

Since Sedgwick concluded Haisley had erroneously received LTD benefits for a period of time commencing on October 3, 2007, and ending on November 30, 2007, Haisley was instructed to reimburse PNC in the amount of $6,154.60 within thirty days. (*Id.*) Haisley was informed that she had 180 days to appeal Sedgwick's decision denying her application. (*Id.*) Haisley appealed Sedgwick's denial of her LTD claim by means of a letter authored by her counsel, Steven F. Kessler ("Kessler"), on May 7, 2008. (AR0142-44.) Enclosed with the appeal letter were additional documents that were supplied by Haisley's health-care providers. (ECF No. 96 ¶ 50.) The submission included several pages of treatment notes from Dr. Majkic's office. (AR0146-79.) In a letter to Kessler dated March 27, 2008, Dr. Kasdan stated that Haisley was "still disabled from her job" due to "multifocal motor neuropathy." (AR0145.) Dr. Kasdan remarked that this condition was very difficult to diagnose, and explained why he had not previously made this diagnosis with respect to Haisley. (*Id.*) His opinion was based, at least in part, on nerve conduction studies of Haisley performed on February 7, 2008. (AR0182-83.) This information was forwarded to Sedgwick in connection with Haisley's appeal. (ECF No. 96 ¶ 50.) Sedgwick was provided with documentary evidence establishing that Haisley was awarded social security disability benefits on April 20, 2008. (*Id.*)

In a letter to Kessler dated April 3, 2008, Dr. White took issue with much of what Graham had said in the letter denying Haisley's LTD claim. (ECF No. 63, Ex. K, BAH000376-79.) He stated that his teleconference with Dr. Givens "lasted no more than ten minutes," and involved only a few questions. (ECF No. 63, Ex. K, BAH000377.) Dr. White declared that "objective mini-mental status exams" conducted on March 17, 2008, and March 25, 2008, confirmed the accuracy of Haisley's "subjective complaints of difficulty with memory and concentration." (ECF No. 63, Ex. K, AH000378.) Dr. White made the following observations:

> Dr. Givens also refers to "insufficient objective evidence . . . to support (Ms. Haisley's) complete inability to work due to cognitive dysfunction." The wording "complete inability" almost conjures up the image of a comatose state. The usual understanding of disability to my knowledge is not that a patient's abilities have entirely evaporated, but that he/she cannot sustain those abilities in an effective manner in the work setting. I would also point out that I never maintained that Ms. Haisley's inability to return to work was due solely to cognitive dysfunction. Indeed, my reports are replete with references to a marked depressed mood, tearfulness, a protracted sleep disturbance, physical exhaustion and fatigue, loss of energy and motivation, escalating anxiety over the meaning of her physical symptoms, and the daily lower leg pain that precludes her standing or sitting comfortably for any extended period of time. It is precisely the convergence of all of these symptoms, not just cognitive impairments, that makes it impossible for Ms. Haisley to return to work.

(ECF No. 63, Ex. K, BAH000378-79.) Dr. White concluded the letter by remarking that the denial of Haisley's claim only aggravated her condition, and a "positive resolution" was warranted. (ECF No. 63, Ex. K, BAH000379.) The parties vigorously dispute whether Dr. White's letter was forwarded to Sedgwick in connection with Haisley's appeal. (ECF No. 96 ¶¶ 51-69.) While Haisley contends that Kessler forwarded the letter to Sedgwick when the appeal was filed, Sedgwick maintains that the letter was not included within Haisley's submission. (*Id.* ¶ 51.)

Haisley's appeal was reviewed by Dr. Steven M. Arbit, a physiatrist, and Dr. Marcus J. Goldman, a psychiatrist. (ECF No. 63, Ex. K, BAH000193-200.) Dr. Arbit conducted teleconferences with Dr. Kasdan and Dr. Majkic respectively, on June 3, 2008, and June 4, 2008. (ECF No. 63, Ex. K, BAH000193.) Dr. Kasdan expressed the view that Haisley's neuropathy would inhibit her ability to work. (ECF No. 63, Ex. K, BAH000194.) In a written report dated June 6, 2008, Dr. Arbit described his teleconference with Dr. Majkic as follows:

> Dr. Majkie [sic] told me that Ms. Haisley reports to him that she can [sic] sit, stand, or walk for more than 30 minutes at a time because she develops pain, but if she is sitting for 30 minutes, and she gets up and walks, her pain in her legs go [sic] away. He states that it is due to neuropathic pain because she has a neuropathy. I explained to him that I was doing the review from a PM&R

> perspective and he told me that it [sic] is more to it than just PM&R, that there are some psychiatric issues and psychological issues. I asked if he felt that from a physical standpoint she would be able to do a job that would enable her to move around every 30 minutes from sitting to standing and there would not be static positioning, and he felt purely from a physical standpoint that she would be able to do that.

(ECF No. 63, Ex. K, BAH000193.) Dr. Arbit opined that Haisley's neuropathy would not prevent her from returning to her position at PNC, which he described as a "sedentary job." (ECF No. 63, Ex. K, BAH000194-95.)

On June 4, 2008, Dr. Goldman spoke with Dr. White. (ECF No. 63, Ex. K, BAH000197.) Dr. White claimed that Haisley "would not be able to perform the [] work duties associated with her prior job due to depression and fatigability." (*Id.*) After conferring with Dr. White, Dr. Goldman determined that Haisley's impairments would not preclude her return to work. (ECF No. 63, Ex. K, BAH000199.) He stated that Dr. White's treatment records did "not contain sufficient objective or observable data to establish significant psychopathology that would preclude worker functionality." (ECF No. 63, Ex. K, BAH000200.) Dr. Goldman noted that there was "no quantified data" to support a finding that Haisley suffered from "significant cognitive dysfunction." (*Id.*)

In a letter dated June 23, 2008, Sedgwick's appeals specialist Tim A. Prater ("Prater") informed Kessler that Sedgwick decided to uphold its prior decision denying Haisley's claim. (AR0220-23.) This determination was based primarily on the recommendations that had been made by Dr. Arbit and Dr. Goldman. (*Id.*) Prater's letter stated that no further information would be considered in connection with Haisley's claim, and that the administrative record involving that claim was closed. (AR0222.)

Haisley commenced this action on October 16, 2008, alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (ECF No. 1.)

On July 7, 2010, the parties filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF Nos. 56 & 59.) These motions are the subject of this memorandum opinion.

## II. Standard of Review

Since Haisley argues that she was wrongfully denied "benefits due" to her under existing Plan provisions, her claims are properly grounded in 29 U.S.C. § 1132(a)(1)(B). *Eichorn v. AT&T Corp.*, 484 F.3d 644, 651, 653 (3d Cir. 2007). The standards applicable to claims arising under this statutory provision were articulated by the United States Supreme Court in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), and *Conkright v. Frommert*, ___U.S.___, 130 S.Ct. 1640 (2010).

In *Firestone Tire*, the Supreme Court observed that the ERISA did not contain specific language establishing a judicial standard of review for claims arising under § 1132(a)(1)(B). *Firestone Tire*, 489 U.S. at 108-09. Turning to principles of trust law, the Supreme Court explained that while "a deferential standard of review" was appropriate when a trustee exercised "discretionary powers," *de novo* review of eligibility determinations was warranted when the particular plan at issue did not provide the relevant employer or administrator with "discretionary or final authority to construe uncertain terms." *Id.* at 110-13. It was determined that, in the absence of specific language according deference to determinations made by a plan administrator, the *de novo* standard of review would apply "regardless of whether the plan at issue [was] funded or unfunded and regardless of whether the administrator or fiduciary [was] operating under a possible or actual conflict of interest." *Id.* at 115. The Supreme Court acknowledged that where a benefit plan gave discretionary powers to an administrator or fiduciary who was operating under a conflict of interest, it was appropriate for that conflict to be

weighed as a factor relevant to whether the discretionary authority given to the administrator or fiduciary had been abused. *Id.*

In *Glenn*, the Supreme Court clarified that a "conflict of interest" exists where "a plan administrator both evaluates claims for benefits and pays benefits claims." *Glenn*, 554 U.S. at 112. The existence of such a conflict, however, does not deprive a plan administrator of whatever discretionary authority that it may possess under *Firestone Tire*. Instead, the conflict is merely one factor relevant to a determination with respect to whether an abuse of discretion has occurred. *Id.* at 115-17. The importance of a conflict as a factor depends upon whether the factual circumstances of the case at issue suggest that the conflict actually affected the challenged administrative decision, or upon whether the relevant plan administrator "has a history of biased claims administration." *Id.* at 117. The Supreme Court opined that a conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.*

These principles were discussed further in *Conkright*, in which the Supreme Court declared that a single mistake by a plan administrator cannot serve as a basis for depriving that administrator of deference that would otherwise be warranted under *Firestone Tire*. *Conkright*, 130 S.Ct. at 1644-47. It was noted that deference to the findings of a plan administrator, where warranted under the terms of the plan in question, promoted the goals of "efficiency," "predictability" and "uniformity." *Id.* at 1649. Deference promotes efficiency by encouraging the resolution of benefits disputes by means of "internal grievance procedures," rather than by means of "costly litigation." *Id.* Predictability is ensured by standards allowing an employer to

"rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from *de novo* judicial review." *Id.* Uniformity is secured when an employer is able to "avoid a patchwork of different interpretations of a plan" that covers multiple employees in several different jurisdictions. *Id.* ERISA does not affirmatively require employers to establish employee benefit plans, nor does it mandate what types of benefits must be provided by employers who choose to create such plans. *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). It should not be construed in such a way as to "lead those employers with existing plans to reduce benefits," or to discourage employers without such plans from adopting them in the first place. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987). Instead, it should be interpreted in light of its objectives of ensuring the enforcement of employees' rights under existing employee benefit plans and encouraging employers to create additional employee benefit plans. *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 215 (2004).

## III. Discussion

### A. <u>Proper Defendants</u>

Haisley brings her claims pursuant to 29 U.S.C. § 1132(a)(1)(B), which permits a plan "participant" or "beneficiary" to bring a civil action "to recover benefits due him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B). Before reaching the merits of Haisley's claims, the court must address a preliminary matter concerning whether Sedgwick and PNC are proper defendants in this action. Sedgwick and PNC maintain that they are not proper defendants, and that the Plan is the only defendant that can properly be named in a case such as this. (ECF No. 84 at 18-19.) Some decisions support this argument. *See Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482,

1491 (7th Cir. 1996); *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993); *Madden v. ITT Long Term Disability Plan for Salaried Emps.*, 914 F.2d 1279, 1287 (9th Cir. 1990); *Olick v. Kearney*, 451 F.Supp.2d 665, 672 (E.D.Pa. 2006). The United States Court of Appeals for the Third Circuit takes a different approach. In *Hahnemann University Hospital v. All Shore, Inc.*, 514 F.3d 300, 308 (3d Cir. 2008), the court of appeals observed that a court can direct a plan administrator to pay benefits from the assets of a plan just "as a trustee may be compelled to satisfy a trust obligation from trust assets. *See Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 301 (3d Cir. 2007)(remarking that plan administrators can be named in their official capacities in actions brought under § 1132(a)(1)(B)).

The statutory language most relevant to the court's analysis is codified at 29 U.S.C. § 1132(d), which provides:

> **(d) Status of employee benefit plan as entity.** (1) An employee benefit plan may sue or be sued under this title as an entity. Service of summons, subpoena, or other legal process of a court upon a trustee or an administrator of an employee benefit plan in his capacity as such shall constitute service upon the employee benefit plan. In a case where a plan has not designated in the summary plan description of the plan an individual as agent for the service of legal process, service upon the Secretary shall constitute such service. The Secretary, not later than 15 days after receipt of service under the preceding sentence, shall notify the administrator or any trustee of the plan of receipt of such service.
> (2) Any money judgment under this subchapter against any employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this title.

29 U.S.C. § 1132(d). There is no question that, under this statutory language, the Plan is a proper defendant in this action. It is also clear that an entity or "person" other than a plan can be liable for a "money judgment" under certain circumstances.[3] The only remaining questions are

---

[3] An award of "benefits due" under § 1132(a)(1)(B) can constitute a "money judgment." *Evans v. Akers*, 534 F.3d 65, 73 (1st Cir. 2008); *Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d at 309.

whether Sedgwick and PNC are proper defendants under the present circumstances, and whether Haisley's claims would subject them to direct monetary liability.

Under the ERISA, a fiduciary who breaches a fiduciary duty in connection with a plan may "be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, . . . ." 29 U.S.C. § 1109(a). "When a denial of 'benefits due' arises from a plan administrator's breach of its fiduciary obligations to the claimant," the plan beneficiary may "seek redress for the breach directly from the plan administrator as a fiduciary." *Hahnemann Univ. Hosp.*, 514 F.3d at 309.

In this case, Haisley is seeking benefits solely from the assets of the Plan. (ECF No. 1 at 9-10.) She is not pursuing relief against Sedgwick and PNC in their individual capacities. Haisley's claims against Sedgwick and PNC are against them in their official capacities. Because a judgment in Haisley's favor would be enforceable only against the assets of the Plan itself, Sedgwick and PNC are only nominal defendants. *Patrick v. Verizon Servs. Corp.*, Civil Action No. 07-766, 2009 WL 2043914, at *16 (W.D.Pa. July 8, 2009)(recognizing an official-capacity claim against a plan administrator as being "essentially a claim that is only nominally asserted against the plan administrator and is, for all practical purposes, a claim against the relevant plan itself").

The exercise of control over the administration of benefits is the "defining feature" of a proper defendant in an action brought under § 1132(a)(1)(B). *Evans v. Emp. Benefit Plan*, 311 F.App'x 556, 558 (3d Cir. 2009). It is undisputed that Sedgwick was responsible for denying Haisley's claim at both the initial and appellate stages of the administrative process. (AR0133-36, AR0220-23.) The plain language of the Plan designates PNC as the "Plan Administrator,"

thereby giving PNC the power "[t]o determine the eligibility and status of any [e]mployee with respect to Plan participation." (AR0233, AR0245.) As the Plan Administrator, PNC obviously plays *some* role in administering the Plan. *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 234 (3d Cir. 1994). Consequently, Haisley can pursue official-capacity claims against both Sedgwick and PNC.[4] *Graden*, 496 F.3d at 301.

### B.    The Merits of Haisley's Claims

Haisley seeks both an order requiring the defendants to pay all LTD benefits owed to her under the terms of the Plan and a declaration clarifying her entitlement to future benefits under the Plan. (ECF No. 1 at 9-10.)

The first step in the court's analysis is to determine whether the decisions of Sedgwick and PNC are entitled to deference under the terms of the Plan. *Firestone Tire*, 489 U.S. at 115. As the Plan Administrator, PNC is accorded the powers "[t]o interpret the Plan" and "[t]o determine the eligibility and status of any [e]mployee with respect to Plan participation." (AR0233, AR0245.) The Plan expressly provides that "[t]he Administrator shall have complete and sole discretion with regard to each of [these] powers," and that "no decision of the Administrator shall be overturned unless the decision is arbitrary and capricious." (AR0245.) Pursuant to the terms of the Service Agreement, Sedgwick is "responsible for claims administration for any employee applying for LTD [benefits]" under the Plan. (AR0271.) Given the clear and unambiguous language of the Plan, the court cannot review the challenged determination *de novo*. *Firestone Tire*, 489 U.S. at 115. Instead, the dispositive inquiry is whether the decision denying Haisley's application for LTD benefits was "arbitrary and capricious." *Id.* Before considering the factors relevant to that inquiry, however, the court must

---

[4] This issue is not significant because the Plan remains "the real party in interest" in any event. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

address an argument raised by defendants concerning the timeliness of Haisley's application for LTD benefits.

### 1.    Timeliness

Defendants argue that Haisley's claims are time-barred under the terms of the Plan. (ECF No. 84 at 16-18.)  They base their argument on language stating that "[a]ny claim for benefits under the Plan must be filed with the Claims Administrator not later than 90 days following the date Total Disability begins."  (AR0246.)  Haisley applied for LTD benefits on October 11, 2007.  She listed May 2, 2007, as the first day that she had noticed her symptoms and June 22, 2007, as the last day that she had worked.  Her STD benefit period commenced on July 5, 2007.  Defendants contend that Haisley's claims cannot proceed, since she did not apply for LTD benefits within 90 days of July 5, 2007.

Haisley points out that the Plan contains an ambiguity concerning the timeliness of her application.  Under the heading "Notice of Claim," the Plan provides:

a.    The Participant must notify his Benefits Department within 30 days of the date Total Disability starts, if that is possible.  If that is not possible, the Benefits Department must be notified as soon as it is reasonably practicable to do so, but in any event no later than 120 days after the date Total Disability starts.

b.    Upon notification by the Participant, the Benefits Department will forward to the Participant a claim form to be completed by the Participant and the Participant's Physician.  This claim form should be completed by the Participant and the Participant's Physician within 60 days of the date Total Disability starts if that is possible, or if it is not possible, as soon as it is reasonably practicable to do so, but in any event no later than 180 days after the date Total Disability starts.

c.    The Participant's Benefits Department will complete the Employer section of the claim form and forward it to the Administrator or its designated agent.

(AR0245-46.)  Haisley argues that this language when read with the language creating the ninety-day limitations period relied upon by defendants created an ambiguity, and that this ambiguity should result in a construction of the Plan language that is favorable to her.  She contends that defendants waived the defense of untimeliness by failing to assert it during the course of the administrative proceedings.  (ECF No. 88 at 12-13.)

Under the doctrine of *contra proferentem*, ambiguous provisions of insurance policies are generally construed in favor of the insured and against the insurer.  *Royal Ins. Co. of Am. v. KSI Trading Corp.*, 563 F.3d 68, 74 (3d Cir. 2009).  "The policy rationale underlying strict application of the doctrine is that because most insurance agreements are drafted by the insurance industry, they are essentially contracts of adhesion."  *Pittson Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 520 (3d Cir. 1997).  Because the insurance company is typically the drafter of the ambiguous contractual language at issue, it must suffer any negative consequences stemming from its own failure to draft clear and unambiguous language.  In *Kunin v. Benefit Trust Life Insurance Co.*, 910 F.2d 534 (9th Cir. 1990), the United States Court of Appeals for the Ninth Circuit explained:

> Insurance policies are almost always drafted by specialists employed by the insurer.  In light of the drafters' expertise and experience, the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence.  Moreover, once the policy language has been drafted, it is not usually subject to amendment by the insured, even if he sees an ambiguity; an insurer's practice of forcing the insured to guess and hope regarding the scope of coverage requires that any doubts be resolved in favor of the party who has been placed in such a predicament.

*Kunin*, 910 F.2d at 540.  Alluding to the doctrine of *contra proferentem*, Haisley asserts that the ambiguous portions of the Plan should be read in a manner that does not unfairly disadvantage LTD claimants, and that protects the contractually-defined benefits established by the Plan.

In *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257-58 (3d Cir. 1993), the United States Court of Appeals for the Third Circuit held that the doctrine of *contra proferentem* should be applied where the language of a plan is ambiguous about whether the plan administrator has the type of discretion that would warrant deference under *Firestone Tire*. In other words, an ambiguity about whether a plan accords discretion to a plan administrator should ordinarily result in a determination that *de novo* review of the plan administrator's findings is required under the ERISA. *Heasley*, 2 F.3d at 1257-58. In the aftermath of *Heasley*, district courts within this circuit have expressed differing views about whether *contra proferentem* should be utilized as a vehicle for interpreting other types of plan provisions. Some courts have indicated that the doctrine should be applied to ambiguous plan terms whenever the relevant ambiguity cannot otherwise be satisfactorily resolved. *Erbe v. Connecticut Gen.l Life Ins. Co.*, 695 F.Supp.2d 232, 248 (W.D.Pa. 2010); *Cohen v. Standard Ins. Co.*, 155 F.Supp.2d 346, 354 n.7 (E.D.Pa. 2001). Other courts have determined that the application of *contra proferentem* is inappropriate where a plan grants a plan administrator discretion to interpret plan provisions, given the tension between the doctrine's preference for a construction favoring the claimant and the deference owed to the findings of the plan administrator under *Firestone Tire*. *Fahringer v. Paul Revere Ins. Co.*, 317 F.Supp.2d 504, 519 (D.N.J. 2003); *Murdock v. UNUM Provident Corp.*, 265 F.Supp.2d 539, 542 (W.D.Pa. 2002); *Friends Hosp. v. Metra Health Serv. Corp.*, 9 F.Supp.2d 528, 531 (E.D.Pa. 1998).

In this case, there is no need for the court to determine whether *contra proferentem* should be applied, or to otherwise resolve the ambiguity created by the different limitations periods referenced in the language of the Plan. Even if it is assumed that judicial deference to the findings of Sedgwick and PNC is appropriate, the ninety-day limitations period was not

relied upon as a basis for denying Haisley's claim during the course of the administrative proceedings. Sedgwick initially *approved* Haisley's application for LTD benefits in a letter from Graham dated November 30, 2007. When Haisley's claim was later "suspended" as of December 1, 2007, "a lack of current treatment information on file supportive of continuing total disability" was given as the reason for the suspension. (AR0100.) Haisley was given until January 17, 2008, to submit additional information in support of her claim. The claim was formally denied on February 29, 2008, based on the opinions of Dr. Givens and Dr. Pemmaraju. On June 23, 2008, Haisley was told that the prior denial of her claim had been upheld on appeal pursuant to the recommendations of Dr. Arbit and Dr. Goldman. At every step of the administrative process, Haisley's claim was considered on *substantive* grounds. There would have been no need for Sedgwick to provide Haisley with an opportunity to submit additional medical evidence if the filing of her claim had been untimely in any event. Even if it is assumed that judicial deference to an administrator's finding of untimeliness would normally be appropriate, no such finding was made in this case. Having declined to invoke the ninety-day limitations period as a basis for denying Haisley's LTD claim during the course of the administrative proceedings, Sedgwick and PNC cannot turn around and rely on it as a basis for defeating Haisley's claims under the ERISA. *O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 697 F.Supp.2d 474, 478 (W.D.N.Y. 2010)(holding that a plan administrator had waived the defense of untimeliness by failing to assert it as a basis for denying a claim for benefits under a plan). Accordingly, the court's analysis will proceed.

### 2.    The Application of the "Arbitrary and Capricious" Standard of Review

Since "benefits determinations arise in many different contexts and circumstances," the factors to be considered from one case to the next are "varied and case-specific." *Estate of*

*Schwing v. Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009). "[A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Glenn*, 554 U.S. at 117. The court will consider all factors relevant to this case to determine whether defendants' decision to deny Haisley's claim on the basis of the existing record was arbitrary and capricious.

In a letter dated November 30, 2007, Graham informed Haisley that Sedgwick had "approved" her application for LTD benefits. The letter stated that Haisley would receive a check in the amount of $6,154.54 for a period of disability commencing on October 3, 2007, and ending on November 30, 2007. In that letter, Graham stated:

> On a periodic basis, we will need to verify your ongoing eligibility for benefits. We will be requesting information from you and your attending physicians. Please ensure that the necessary information is submitted on a timely basis to avoid any possible delay in your future benefit payments.
>
> Our experience with disability claims has shown that many people are capable of returning to work activities within a short period of time after becoming disables [sic]. We will continue to monitor your medical condition with periodic updates to determine when return to work becomes a possibility. At that time, rehabilitation assistance may be available for you.

(ECF No. 63, Ex. K, BAH000127.) Although Haisley was informed that her "ongoing eligibility for benefits" would need to be verified in order for her to receive "future benefits payments," she was not told that the information that she had already provided was insufficient to establish her initial entitlement to LTD benefits.

On December 20, 2007, Sedgwick informed Haisley that it "suspended" her claim as of December 1, 2007, due to "a lack of current treatment information on file supportive of continuing total disability."[5] (AR 0100.) Haisley learned of this decision by means of a letter authored by Graham. In the letter, Graham stated that Dr. White's report of November 9, 2007,

---

[5] Sedgwick's sudden reversal was apparently triggered by the recommendation of a Sedgwick supervisor, rather than by new information about Haisley's medical condition. (*See* AR0025.)

had not been supported by treatment records or details concerning Haisley's medication regimen. The same report, however, had previously been deemed sufficient to justify an award of LTD benefits to Haisley. Indeed, Haisley's recurrent major depression was specifically referenced in Graham's letter of November 30, 2007, as Sedgwick's principal basis for "approving" Haisley's request for LTD benefits. When the claim was formally denied on February 29, 2008, Haisley was instructed to reimburse PNC for the LTD benefits that had already been paid to her. The United States Court of Appeals for the Third Circuit has remarked that a plan administrator's "[i]nconsistent treatment of the same facts" should be "viewed with suspicion." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir. 2000). Having approved Haisley's application, Sedgwick *retroactively* determined that an award of LTD benefits was not warranted in the first place. Such inconsistent treatment of the same medical information is a factor that weighs in Haisley's favor. *Post v. Hartford Ins. Co.*, 501 F.3d 154, 164-65 (3d Cir. 2007)(referring to a "reversal of position without additional medical evidence" as being among "numerous procedural irregularities that can raise suspicion"). The court of appeals recently observed that "[a]n administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion." *Miller v. American Airlines, Inc.*, ___F.3d___, ___, 2011 WL 208291, at *7 (3d Cir. 2011),

Another factor weighing in favor of Haisley is that she was never asked to undergo an independent medical examination. The Plan unambiguously provides the Plan Administrator with the authority to have a claimant examined by a physician "as often as reasonably required." (AR0246.) Where the plan at issue specifically provides a plan administrator with the authority to request an independent medical examination, the failure of the plan administrator to procure

23

such an examination before denying a particular claim may "raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). Although the ERISA does not require a plan administrator to request that a claimant undergo a medical examination before denying his or her claim, the failure to procure such an examination may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review. *See Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006); *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F.Supp.2d 261, 296 (W.D.Pa. 2008).

Dr. Majkic, Dr. White and Dr. Kasdan all believed Haisley to be disabled. Haisley was not examined by Dr. Givens, Dr. Pemmaraju, Dr. Arbit or Dr. Goldman. Because Haisley's claim was based on a confluence of mental and physical impairments, it weighs against defendants for Sedgwick to place considerable weight on opinions expressed by medical professionals who never examined her. *See Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F.Supp.2d 546, 559-60 (W.D.Pa. 2009). Unlike types of physicians who can "formulate medical opinions based upon objective findings derived from objective clinical tests," a psychiatrist typically treats an individual's "subjective symptoms." *Sheehan v. Metro Life Ins. Co.*, 368 F.Supp.2d 228, 255 (S.D.N.Y. 2005). In contrast to some physical impairments, which can be verified or discounted solely by reference to reports of objective medical tests, mental impairments are generally identified on the basis of a psychiatric professional's interactions with an impaired individual. *Id.* Moreover, Dr. Kasdan determined that Haisley was suffering from "multifocal motor neuropathy," which he described as being difficult to diagnose. Although Haisley suffered from impairments that were not amenable to objective evaluation by means of a file review, she was not asked to undergo a physical or mental examination. Under these

circumstances, Sedgwick's reliance on the opinions of nonexamining medical consultants is a factor that weighs in favor of plaintiff.[6] *See Lanier v. Metro. Life Ins. Co.*, 692 F.Supp.2d 775, 787-89 (E.D.Mich. 2010).

In the letter dated November 30, 2007, Graham informed Haisley that she needed to apply for social security disability benefits in order to avoid a reduction in the amount of LTD benefits that she was receiving. Haisley was awarded disability insurance benefits under Title II of the SSA on April 20, 2008. Information about the award was forwarded to Sedgwick in connection with Haisley's appeal. Haisley's receipt of Social Security disability benefits was not addressed in Sedgwick's denial letter of June 23, 2008.

In *Glenn*, the Supreme Court remarked that a plan administrator's failure to address a claimant's award of social security disability benefits in denying a claim "suggested procedural unreasonableness" under circumstances in which the plan administrator had itself encouraged the claimant to apply for such benefits. *Glenn*, 554 U.S. at 118. This is another factor which weighs in favor of Haisley's argument that Sedgwick's treatment of her claim was arbitrary and capricious. The court acknowledges that the standards applicable to social security disability benefits are not the same as those applicable to LTD benefits under the Plan. While a social security disability claim must be evaluated under "a uniform set of federal criteria," "employers have large leeway to design disability and other welfare plans as they see fit." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003). The SSA's standard for establishing the existence of a statutory disability is demanding. Title II of the SSA defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically

---

[6] ERISA does not require plan administrators to "accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). It, however, is equally true that a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[7]  42 U.S.C. § 423(d)(1)(A).  Under the terms of the Plan, an individual may be deemed to be "totally disabled" for a period of twenty-four months if he or she "cannot perform each of the material duties of his or her *regular occupation*."  (AR0234 (emphasis added).)  It is only after an individual has received LTD benefits for a twenty-four-month period that he or she must demonstrate an inability to "perform each of the material duties of *any gainful occupation* for which he or she is reasonably fitted by training, education or experience."  (*Id.* (emphasis added).)  Given that Haisley was required to apply for social security benefits and had satisfied the SSA's standard for establishing the existence of a disability, it was unreasonable for Sedgwick to ignore the award of social security disability benefits in determining that she failed to surmount the significantly less demanding hurdle of establishing her inability to perform the duties of a particular job.  *Porter v. Broadspire*, 492 F.Supp.2d 480, 487 (W.D.Pa. 2007).

The Supreme Court has consistently recognized that a plan administrator's conflict of interest constitutes a factor relevant to whether a decision denying a claimant's application for benefits is arbitrary and capricious.  *Glenn*, 554 U.S. at 111; *Firestone Tire*, 489 U.S. at 115.  In *Glenn*, the Supreme Court clarified that such a conflict exists where a plan administrator "both evaluates claims for benefits and pays benefits claims."  *Glenn*, 554 U.S. at 112.  PNC established a "Group Benefits Trust" to fund LTD disability payments made pursuant to the Plan.  As the Plan Administrator, PNC has the power "[t]o determine the eligibility and status of any [e]mployee with respect to Plan participation."  (AR0233, AR0245.)  The Service Agreement delegates to Sedgwick the responsibility for administering LTD claims under the

---

[7] The definition contained in Title XVI of the SSA, while phrased differently, is not materially different from that contained in Title II.  42 U.S.C. § 1382c(a)(3)(A).

Plan. While the parties dispute the extent to which PNC exercises control over LTD benefits determinations, the record contains a declaration from Kerry A. Allen ("Allen"), PNC's Vice President and Benefits Manager of Corporate Retirement Plans, explaining the manner in which PNC finances and administers the Plan. (AR0333-34.) In her declaration, which was signed on September 11, 2009, Allen explained:

> 5.      The Plan is a fully self-funded employee welfare benefit plan as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Plan provides long term disability benefits for eligible employees of PNC. A third party does not insure the Plan. It is self-funded by means of a separate trust established by PNC solely for the purpose of providing benefits. The Trust is known and referred to as the "Group Benefits Trust" (the "GBT").

> 6.      PNC makes fixed, periodic cash contributions to the GBT based on calculations and projections of its future long term disability liability performed by an independent actuary. PNC holds no residual interest in the assets of the GBT. Rather, any and all monies in the trust are contributed without condition at all times and at all times must be used for the exclusive benefit of Plan participants or beneficiaries.

> 7.      Long term disability benefits determined to be payable under the terms of the Plan are paid from the GBT.

(AR0334.) Haisley points to no evidence which directly contradicts Allen's declaration.[8] Therefore, the court considers Allen's statements to be true. *Wang v. Lake Maxinhall Estates, Inc.*, 531 F.2d 832, 835, n.10 (7th Cir. 1976).

Since PNC both funds the Plan and serves as the Plan Administrator, a conflict of interest *exists*. *Glenn*, 554 U.S. at 115. The *significance* of this conflict, however, is in dispute. *Id.* In *Post v. Hartford Insurance Co.*, 501 F.3d 154 (3d Cir. 2007), the United States Court of Appeals for the Third Circuit expressed "particular concern" about plans that are "funded on a case-by-

---

[8] While Haisley implicitly disputes some of the statements contained in Allen's declaration, she cites only to language found in the Plan and the Service Agreement in support of her argument. (ECF No. 96 ¶¶ 8-13.) The language of the Plan and the Service Agreement, though relevant to the overall inquiry, does not directly contradict Allen's statements concerning how the Plan is actually funded and administered on a day-to-day basis.

case basis" and plans that are "funded and administered by an outside insurer." *Post*, 501 F.3d at 163. Where an administrator "pays claims out of its operating budget" on a case-by-case basis "rather than from segregated monies that the employer sets aside according to an actuarial formula," "each dollar paid out is a dollar out of the administrator's pocket," thereby giving the administrator "a financial incentive to deny claims." *Id.* "This concern is compounded when it is an outside insurer, rather than the employer, that funds and administers the plan," since an employer which is "a step removed from the process" is not likely to suffer "the full effects of employee dissatisfaction" resulting from poor claims handling. *Id.* at 163-64. Allen declared that PNC makes "fixed, periodic cash contributions" to the Group Benefits Trust, making it clear that LTD claims are not funded on a case-by-case basis. (AR0334.) She clarified that the Plan is not insured by a third party. (*Id.*) Thus, the specific concerns expressed by the court of appeals in *Post* are not present in this case.[9]

In *Glenn*, the Supreme Court observed that a conflict of interest would be of minimal importance where a plan administrator "has taken active steps to reduce potential bias" and "promote accuracy" "by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Glenn*, 554 U.S. at 117. Under the Service Agreement, PNC is responsible for providing Sedgwick with sufficient funds to cover LTD claims, and Sedgwick is expressly relieved of the obligation to advance its own funds to cover such claims. (AR0273.)

---

[9] These factors were discussed in *Post v. Hartford Insurance Co.*, 501 F.3d 154, 163-64 (3d Cir. 2007), for the purpose of determining the appropriate standard of review. In light of the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 115-16 (2008), the existence of a plan administrator's conflict of interest does not change the standard of review applicable to a claimant's ERISA claim. Nevertheless, such a conflict remains a factor relevant to whether the plan administrator's decision denying the claimant's request for benefits was arbitrary and capricious. *Miller v. American Airlines, Inc.*, ___F.3d___, ___ n.3, No. 10-1784, 2011 WL 208291, at *4, n.3 (3d Cir. 2011); *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 525-26 (3d Cir. 2009).

Hence, PNC has taken some steps to ensure that the administration of LTD claims is not influenced by collateral financial considerations.

Under the present circumstances, the presumed conflict of interest resulting from PNC's dual status as a Plan Administrator and a provider of funds is of minimal importance. Since the other factors are not closely balanced, however, the nature of PNC's conflict of interest is not dispositive in this case. *Glenn*, 554 U.S. at 117. Because Sedgwick rendered inconsistent decisions during the initial stages of the application process, rejected the opinions of three treating health-care providers, relied on the opinions of four nonexamining physicians (even though Haisley's specific impairments were not amenable to evaluation by means of a file review), failed to request an independent medical examination, and ignored Haisley's receipt of social security disability benefits (after having *required* her to apply for them), the court concludes that the decision denying Haisley's application for LTD benefits was arbitrary and capricious even if no significance is placed on PNC's conflict of interest.[10]

The ERISA requires "every employee benefit plan" to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant . . . ." 29 U.S.C. § 1133(1). Regulations promulgated to implement this statutory mandate require a letter denying a claim to include, *inter alia*, "[a] description of any additional information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary . . . ." 29 C.F.R. § 2560.503-1(g)(iii). In her letter denying Haisley's claim on February 29, 2008, Graham referenced Dr. Givens' view that there

---

[10] Although the conflict of interest is insignificant, it is still a factor weighing in favor of Haisley's position. *Miller v. American Airlines, Inc.*, ___F.3d ___, ___, No. 10-1784, 2011 WL 208291, at *6 (3d Cir. 2011)("Even in an actuarially grounded plan, the employer provides the monetary contribution and any money saved reduces the employer's projected benefit obligation.").

was "no specific testing of cognitive functioning in the records but only subjective complaints of difficulty with concentration and memory." (AR0134.) The letter apparently placed Haisley on notice that she needed to submit objective evidence of her mental limitations in order to establish her entitlement to LTD benefits under the Plan. Haisley responded by securing Dr. White's letter of April 3, 2008, which expressly referenced "two objective mini-mental status exams" conducted on March 17, 2008, and March 25, 2008. (ECF No. 63, Ex. K, BAH000378.)

The parties vehemently dispute whether Dr. White's report of April 3, 2008, was submitted to Sedgwick in connection with Haisley's appeal. (ECF No. 96 ¶¶ 51-69.) Dr. White testified that he gave a hard copy of the report to Haisley, but did not send it directly to Sedgwick. (ECF No. 58-2 at 4.) Haisley testified that she delivered that same copy to Kessler's office, with the understanding that it would be forwarded to Sedgwick for consideration. (ECF No. 58-3 at 3.) When questioned about the report during his own deposition, Kessler stated that it was his practice to "send in everything." (ECF No. 1 at 6.) According to Prater, the "paper file" for Haisley's appeal was destroyed after being converted into an "electronic file," making it difficult to track a misplaced document that was never electronically recorded. (ECF No. 58-5 at 7-8.) Ericka McGrew ("McGrew"), an appeals manager employed by Sedgwick, acknowledged that only the contents of the electronic file was considered. (ECF No. 58-8 at 3.) Sedgwick's internal records indicate that Haisley's appellate submission, which was received on May 16, 2008, included a total of 54 pages.[11] (ECF No. 63, Ex. K, BAH000173.) Only 50 pages of the submission appear in the administrative record. (AR0141-90.) Dr. White's letter was four pages

---

[11] The submission referenced in Sedgwick's records appears to have included a one-page letter from Prater to Kessler acknowledging receipt of Haisley's appeal. (AR0141.) Thus, the submission itself was actually 53 pages. (AR0142-90.) The first page of Kessler's letter was marked with a paper notation reading, "53 pages." (AR0142.) The administrative record also includes a copy of the envelope (or package) that was used to mail the submission to Sedgwick. (AR0191.) It is possible that the 54 pages mentioned in Sedgwick's records included the copy of the envelope (or package) rather than Prater's letter to Kessler. In any event, the four pages consisting of Dr. White's letter could have somehow been lost or misplaced during the course of the appellate process.

long.  (ECF No. 63, Ex. K, BAH000376-79.)  It is not clear whether the letter was lost or misplaced.

While the parties dispute whether Dr. White's report was *submitted* to Sedgwick, they apparently agree that, for one reason or another, the report was never *considered* by Sedgwick. In the report, Dr. White referred to "two objective mini-mental status exams" conducted on March 17, 2008, and March 25, 2008.  (ECF No. 63, Ex. K, BAH000378.)  According to Dr. White, these examinations confirmed the accuracy of Haisley's "subjective complaints of difficulty with memory and concentration."  (*Id.*)  Kessler specifically referred to Dr. White's examination findings in the letter commencing Haisley's appeal.  (AR0143.)  When Dr. Goldman rendered his consultative opinion, he stated that Dr. White's letters did "not contain sufficient objective or observable data to establish significant psychopathology that would preclude worker functionality."  (ECF No. 63, Ex. K, BAH000200.)  A careful review of Dr. Goldman's report reveals that he read *only* Dr. White's letters dated November 9, 2007, and December 31, 2007, both of which predated the objective testing of March 17, 2008, and March 25, 2008.  (ECF No. 63, Ex. K, BAH000198-99.)  Dr. Goldman's report did not indicate he was aware of Dr. White's letter dated April 3, 2008, which described the nature of the *objective* testing that had been conducted in March 2008.[12]

---

[12] Haisley contends that Sedgwick failed to consider properly the specific requirements of her job at PNC in determining that she was not entitled to LTD benefits.  (ECF No. 57 at 13-14.)  Dr. Arbit clearly considered her job duties when he rendered his consultative opinion.  (ECF No. 63, Ex. K, BAH000194.)  Although Dr. Goldman referenced Haisley's "prior job" in his consultative report, he did not particularly focus on the demands of that job. (ECF No. 63, Ex. K, BAH000197-200.)  Where the plan at issue specifically defines the term "disability" by reference to a claimant's inability to perform the duties of his or her specific position, a plan administrator must consider the specific requirements of that position in determining whether the claimant is entitled to benefits.  *Miller v. American Airlines, Inc.*, ___F.3d___, ___, No. 10-1784, 2011 WL 208291, at *_____  (3d Cir. 2011). Because the sedentary nature of Haisley's position was more relevant to her physical impairments than it was to her mental impairments, Dr. Arbit's report may have satisfied Sedgwick's duty to evaluate her claim by reference to her specific job duties.  In any event, the court need not address that issue further, since Haisley is entitled to the relief that she seeks regardless of Sedgwick's failure to account for the specific requirements of her position in connection with her mental impairments.

In his letter to Sedgwick, Kessler stated that Haisley's short-term memory problems had been "evidenced by clinical mental status examinations" conducted on March 17, 2008, and March 25, 2008. (AR0143.) Although the letter mentioned Dr. White's report dated November 9, 2007, it did not explicitly reference the report dated April 3, 2008. (*Id.*) It is arguable that Kessler's reference to the mental status examinations was sufficient to put Sedgwick on notice that important information may have been missing from the appellate record. (ECF No. 96 ¶ 54.) If it was, Sedgwick's failure to retrieve that information was unreasonable. The court need not confront that issue, since the actions of Sedgwick in this case already were found to be arbitrary and capricious for other reasons. For present purposes, it suffices to say that if the report had been properly *considered* by Sedgwick in the first instance, Haisley's administrative appeal may have been successful.[13]

### 3.      The Appropriate Remedy

In determining whether to declare Haisley's entitlement to benefits under the Plan as a matter of law or remand the case to Sedgwick and PNC for further consideration, the court must consider the situation that Haisley was in before the arbitrary and capricious conduct of defendants took place. In *Miller*, the United States Court of Appeals for the Third Circuit explained:

> In deciding whether to remand to the plan administrator or reinstate benefits, we note that it is important to consider the status quo prior to the unlawful denial or termination. *See Hacket* [*v. Xerox Corp. Long-Term Disability Income Plan*], 315

---

[13] Whether Dr. Goldman's recommendation would have changed had he reviewed Dr. White's report dated April 3, 2008, is not known. He specifically discussed Dr. White'e letters dated November 9, 2007, and December 31, 2007, in his consultative report. (ECF No. 63, Ex. K, BAH000198-99.) He stated that the information which had been presented to him "[did] not contain sufficient objective or observable data to establish significant psychopathology that would preclude worker functionality." (ECF No. 63, Ex. K, BAH000200.) Because the missing report from Dr. White referred to the "objective mini-mental status exams" conducted on March 17, 2008, and March 25, 2008, it may have included the very "objective or observable data" that Dr. Goldman was seeking. (ECF No. 63, Ex. K, BAH000378.)

F.3d [771, 776 (7th Cir. 2003)].  As such, an important distinction emerges
between an initial denial of benefits and a termination of benefits after they were
already awarded.  In a situation where benefits are improperly denied at the
outset, it is appropriate to remand to the administrator for full consideration of
whether the claimant is disabled.  To restore the status quo, the claimant would be
entitled to have the plan administrator reevaluate the case using reasonable
discretion.  In the termination context, however, a finding that a decision was
arbitrary and capricious means that the administrator terminated the claimant's
benefits unlawfully.  Accordingly, benefits should be reinstated to restore the
status quo.

*Miller*, ___F.3d at ___,  No. 10-1784, 2011 WL 208291,  at \*16 (3d Cir. 2011).  The reasoning

employed by the court of appeals in *Miller* governs the fashioning of the remedy in this case.

Defendants contend that Haisley "automatically and conditionally began receiving LTD

benefits" upon Sedgwick's receipt of her application, and that Sedgwick "expressly reserved the

right to review and make a determination regarding her claim for LTD benefits."  (ECF No. 96 ¶

27.)  This assertion, however, is contradicted by the documentary record.  In a letter dated

October 16, 2007, Graham acknowledged Sedgwick's receipt of Haisley's application for LTD

benefits.  (AR0032-33.)  The letter stated that *claim determinations* were typically reached

within an average of thirty days.  (AR0032.)  Graham's letter informing Haisley about the

*approval* of her application was dated November 30, 2007, which was more than thirty days <u>after</u>

the earlier letter.  (ECF No. 63, Ex. K, BAH000125.)  The letter dated November 30, 2007,

informed Haisley that she would receive *future benefit checks* on the last business day of each

ensuing month.  (ECF No. 63, Ex. K, BAH000126.)  Haisley was provided with a check in the

amount of $6,154.54 covering the period commencing on October 3, 2007, and ending on

November 30, 2007.  (*Id.*)  She was advised that Sedgwick would need to verify her "*ongoing

eligibility* for benefits," and that any requested information needed to be "submitted on a timely

basis to avoid any possible delay in [her] *future* benefit payments."  (ECF No. 63, Ex. K,

BAH000127 (emphasis added).)  Graham's letter dated November 30, 2007, did not reflect a

*conditional* approval of Haisley's application. Although the letter made clear that Sedgwick would need additional information in the future, the import of the letter was that such information would relate solely to Haisley's entitlement to *future* benefit payments. (*Id.*) There was no suggestion that her *existing* entitlement to LTD benefits was subject to further review.

On December 20, 2007, Haisley was informed that her entitlement to LTD benefits was "formally suspended" as of December 1, 2007. She was instructed to submit additional evidence in support of her claim. When the claim was ultimately denied on February 29, 2008, Haisley was instructed to reimburse PNC for the payment that she had already received. Based upon the direction to reimburse PNC for the payment that she already received under the terms of the Plan, an argument could be made that Sedgwick's decision denying her claim constituted a "revocation" of its earlier decision to grant benefits, rather than simply a "termination" of continuing benefits. Whether called a revocation or termination of benefits the action was improper and a restoration of those benefits is necessary under these circumstances. *Cf. Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 599 (6th Cir. 2001).

As noted earlier, the Plan's definition of "total disability" becomes more restrictive after a claimant has received LTD benefits for a period of twenty-four months. Subject to certain exceptions, payments for a disability attributable to "mental illness" are limited to the first twenty-four months of a claimant's "total disability." (AR0242.) Graham's letter dated November 30, 2007, expressly stated that Haisley's entitlement to LTD benefits could not extend beyond October 2, 2009, given that her disability was mostly based on a mental impairment. (BAH000127.) Since the standards for determining whether Haisley was "totally disabled" under the terms of the Plan changed on October 3, 2009, she is entitled only to an award of benefits covering the period of time commencing on October 3, 2007, and ending on October 2,

2009.[14] *Gessling v. Group Long Term Disability Plan*, 693 F.Supp.2d 856, 873 (S.D.Ind. 2010). Such an award will put her in the same position that she would have been in had her LTD benefits not been unlawfully "terminated," "revoked," or "rescinded." (ECF No. 56 ¶ 13.)

On March 27, 2008, Dr. Kasdan opined that Haisley was "disabled" due to "multifocal motor neuropathy." (AR0145.) In his letter dated April 3, 2008, Dr. White stated that Haisley's disability was attributable to a "convergence" of physical and mental impairments, and not simply to "cognitive impairments." (ECF No. 63, Ex. K, BAH000378-79.) Dr. Majkic informed Dr. Arbit on June 4, 2008, that Haisley's neuropathy was adversely impacting her ability to sit, stand or walk for more than thirty minutes at a time. (ECF No. 63, Ex. K, BAH000193.) Hence, the record contains some evidence linking Haisley's disability to her physical impairments. This issue was not considered by Sedgwick or PNC and the case must be remanded to PNC and Sedgwick for a determination concerning Haisley's potential entitlement to LTD benefits under the terms of the Plan for the period of time postdating October 2, 2009. (ECF No. 56 ¶ 15.)

## VI.    Conclusion

Although Haisley's three treating health-care providers consistently maintained that she was unable to perform the duties of her job, her claim for LTD benefits was denied solely on the basis of reports submitted by nonexamining medical consultants. The circumstances surrounding this denial were particularly questionable in light of Sedgwick's initial determination that Haisley was entitled to LTD benefits. After considering that factor and other relevant factors, this court concludes defendants' decision denying Haisley's claim was arbitrary and capricious. The motion for summary judgment filed by Haisley will be granted in part, and the motion for summary judgment filed by the defendants will be denied. The Plan will be required to pay

---

[14] Haisley's motion for summary judgment requests a retroactive award of benefits covering this twenty-four month period. (ECF No. 56 ¶ 13.)

Haisley LTD benefits for the period commencing on October 3, 2007, and ending on October 2, 2009.  The case will be remanded for PNC and Sedgwick to determine whether Haisley is entitled to benefits after October 2, 2009.  Haisley will be permitted to submit a fee petition itemizing the interest, attorney's fees and costs to which she is entitled pursuant to 29 U.S.C. § 1132(g).  (ECF No. 56 at ¶ 16.)

By the court,

/S/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated:   March 2, 2011